UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| ABRAHAM A.,[1] <br><br> Plaintiff, <br><br> v. <br><br> ANDREW M. SAUL, <br><br> Defendant. | Case No. 19-cv-04350-RMI <br><br> **ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** <br><br> Re: Dkt. Nos. 15, 17 |

Plaintiff, seeks judicial review of an administrative law judge ("ALJ") decision denying his application for disability insurance benefits under Title II of the Social Security Act. Plaintiff's request for review of the ALJ's unfavorable decision was denied by the Appeals Council, thus, the ALJ's decision is the "final decision" of the Commissioner of Social Security which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge (dkts. 9 & 10), and both parties have moved for summary judgment (dkts. 15 & 17). For the reasons stated below, Plaintiff's motion for summary judgment is granted, and Defendant's motion is denied.

**LEGAL STANDARDS**

The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs*., 44 F.3d 1453, 1457 (9th Cir. 1995). The phrase

---

[1] Pursuant to the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Plaintiff's name is partially redacted.

"substantial evidence" appears throughout administrative law and directs courts in their review of factual findings at the agency level. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. at 1154 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## PROCEDURAL HISTORY

On April 5, 2016, Plaintiff filed an application for disability insurance benefits, alleging an onset date of November 5, 2015. *See* Administrative Record "*AR*" at 15.[2] As set forth in detail below, the ALJ found Plaintiff not disabled and denied the application on August 15, 2018. *Id*. at 15-26. The Appeals Council denied Plaintiff's request for review on May 23, 2019. *See id*. at 1-4. Thereafter, on July 29, 2019, Plaintiff sought review in this court (dkt. 1), contending that the ALJ's improper rejection of his testimony and his treating physician's opinion compounded to infect the ALJ's Step Four determination rendering it erroneous. *See* Pl.'s Mot. (dkt. 15) at 6. Defendant contends that the ALJ properly evaluated the evidence in question, but that if the court disagrees and finds error in this regard, the proper remedy would be a remand for further proceedings. *See* Def.'s Mot. (dkt. 17) at 8-18.

## SUMMARY OF THE RELEVANT EVIDENCE

Plaintiff was born in 1954, and was 60 years old at the time of his alleged onset date. *See* Pl.'s Mot. (dkt. 15) at 8. Plaintiff alleges disability based on osteoarthritis and total knee replacements in both legs, degenerative disc disease of the lumbar spine with radiculopathy (a

---

[2] The *AR*, which is independently paginated, has been filed in several parts as a number of attachments to Docket Entry #14. *See* (dkts. 14-1 through 14-32).

range of symptoms produced by the pinching of a nerve root in the spinal column), carpal tunnel syndrome, and diabetes. *Id*. In November of 2015, Plaintiff suffered a fall while working atop an eight-foot ladder; in the course of the fall, Plaintiff's legs became entangled within the rungs of the ladder, causing him and the ladder to fall together backwards to the ground with the ladder landing on top of him. *AR* at 974. As a result of this fall, Plaintiff's lower back pain increased and began to occasionally radiate to his left lower thigh. *Id*. After the onset of these conditions, in 2016 and 2017, Plaintiff's attempts at going back to work were unsuccessful because he quickly found that he was unable to tolerate the pain in his back and legs. Pl.'s Mot. (dkt. 15) at 9. Each time Plaintiff attempted to return to work, the pain worsened; initially, he found himself unable to walk for long periods of time, and eventually, the pain worsened to the point where he was even unable to stand and walk long enough to shop for groceries, and was forced to use an electric cart at the grocery store. *Id*. By 2020, Plaintiff was no longer even able to drive or do household chores, and rarely ventures to even leave his home. *Id*.

### *Medical Evidence*

Plaintiff has had a long history of pain in both knees rooted in degenerative arthritis. *AR* at 674, 680. His orthopedic surgeon, Paul Brant Harradine M.D., noted in August of 2016 (the date on which Plaintiff's total right knee replacement operation was performed) that "[t]he patient has over the last several years had progressive limitations of function and pain . . . [and] has failed conservative measures including physical therapy, injections, anti-inflammatories, and assistive devices." *Id*. In advance of the knee replacement surgeries, Plaintiff was warned that the success of the operations depended, in part, on the mechanical devices which were going to be implanted and that such devices can fail or malfunction, in which case they would need to be repaired or replaced; thus, there would be no guarantee as to their longevity in that they could very well fail prematurely. *Id*. That said, Plaintiff's knees were "replaced" in the following fashion. After a midline incision on the surface of the knee, "[a] drill hole was made in the intramedullary canal to accept the intramedullary alignment device . . . [and] [t]he distal femur was pinned at 3 degrees of external rotation." *Id*. at 675. Thereafter, Plaintiff's leg was quite literally disassembled at the knee and the distal femur was cut for 5 degrees such as to be resized in order to allow for a properly

3

sized cutting block to be pinned to the bone. *Id*. Plaintiff's tibia was similarly cut in order to remove a 10 mm portion from its lateral facet such that it too could be resized in order to have a cutting block pinned to its proximal facet. *Id*. Plaintiff's tibia was then "reamed and broached" in order to accept the final prosthesis, while his patella was "prepared for a size 35 button." *Id*. Thereafter, the cut fragments from Plaintiff's femur and tibia were washed out and the cut bone surfaces were pressurized and fortified with a high viscosity cement, while a 35 mm polyethylene button was simultaneously cemented onto his patella, in addition to other hardware that was fixed onto various facets of the knee joint. *Id*. His knee was then brought out to full extension in order to allow for the cement to harden; and, after the excess cement was scraped off with a specialized instrument, the knee was "copiously irrigated," the skin was closed with staples, and a sterile dressing was applied. *Id*. Due to the history of osteoarthritis in both knees, Plaintiff underwent a total knee replacement surgery in his other knee as well. *See id*. at 19.

In addition to Plaintiff's knees, he has been repeatedly diagnosed with degenerative disc disease and radiculopathy of the lumbar spine. *See id*. at 961. In this regard, MRI imaging from 2006 showed "[f]ar lateral disc protrusion at L4-5 out to the right, which impinges the foramen more . . . the deformity should correlate with a right L4 radiculopathy." *Id*. Nine years later, MRI imaging from December of 2015 showed that Plaintiff's lumbar deformities had migrated in both directions up and down his spine, as imaging now also showed "L3-4 broad central and right paracentral disc extrusion with moderated to severe spinal canal stenosis . . . [where the] disc herniation appears edematous and may be acute in nature . . . [coupled with] moderate narrowing of the neural foramina at L3-4." *Id*. Further down the spine, at L5-S-1, Plaintiff's spine showed "mild to moderate spinal stenosis due to disc bulging and moderate facet arthrosis [with] epidural lipomatosis at this level and moderate narrowing of the neural foramina." *Id*. As to the original problem site, the L4-5 impingement that was first identified in 2006, those vertebrae now showed "moderate to severe facet arthrosis and disc bulging [with] moderate spinal stenosis and moderated narrowing of the neural foramina at L4-5." *Id*. The upshot of all of this can be reduced to the objective findings as observed by Plaintiff's treating physician, Yu Zhao M.D., to the effect that Plaintiff's spine is limited to a 25% range of motion, "guarded with pain"; that even lifting his

4

toes or heels causes axial pain in his lumbar spine; and that his spinal deformities result in pain and a slowed gait when Plaintiff attempts to ambulate. *Id*.

*Treating Physician Opinion Evidence*

For these reasons, Dr. Zhao opined in March of 2016 that Plaintiff's conditions have caused him to suffer a number of physical limitations that would require the following restrictions: that he stand no more than 5 cumulative minutes per hour; that he walk no more than 5 cumulative minutes per hour; that he avoid the use of scaffolds and heights; and that he should lift, carry, or pull no more than 5 pounds. *Id*. at 525. Eight months later, in November of 2016, Dr. Zhao ordered that Plaintiff should be placed on a series of permanent modified-activity restrictions, which would be equally applicable to workplace activities as well as daily living activities. *Id*. at 961. In this regard, Dr. Zhao permanently restricted Plaintiff to: (1) avoid prolonged sitting; (2) avoid carrying objects away from the body; (3) avoid twisting maneuvers; (4) stand for no more than 5 cumulative minutes per hour; (5) walk for no more than 5 cumulative minutes per hour; (6) never use scaffolds or work at heights; and (6) avoid lifting, carrying, pushing, or pulling of objects that weigh in excess of five pounds. *Id*. at 961-62.

*Non-Examining Consultants*

In October of 2016, A. Capeda M.D., a non-examining state agency consultant reviewed a series of records and opined that Plaintiff would be capable of work at the medium exertional level. *Id*. at 65. Initially, it should be noted that it appears that Dr. Capeda was unaware of the above-discussed restrictions formulated by Dr. Zhao because Dr. Capeda noted that "[t]here is no indication that there is medical or other opinion evidence." *Id*. at 64. Thus, for the 12-month period following June 13, 2017, Dr. Capeda expressed the following opinions: that Plaintiff can occasionally (up to 33% of an 8-hour workday) lift and carry 50 pounds; that he can frequently (up to 66% of an 8-hour workday) lift and carry 25 pounds; that he can stand and walk for about 6 hours during a normal workday; that he can sit for a total of 6 hours during a normal workday; that he can frequently crouch, stoop, bend, kneel, balance, and climb ramps and stairs; and, that he could occasionally crawl, as well as climb ladders, scaffolds, and ropes. *Id*. at 64-65. Thereafter, in January of 2017, Leslie E. Arnold M.D., another non-examining state agency consultant reviewed

Plaintiff's records and rendered an opinion which concurred with the limitations expressed by Dr. Capeda. *See id*. at 74-76. Dr. Arnold, on the other hand, was able to review the medical records containing Dr. Zhao's opinions and prescribed restrictions, but Dr. Arnold was unpersuaded and concluded that Dr. Zhao's "opinion is without substantial support from other evidence of record, which renders it less persuasive." *Id*. at 77.

### *Hearing Testimony*

On March 30, 2018, Plaintiff and his attorney, as well as a vocational expert ("VE") appeared before the ALJ for a hearing on the claim. *Id*. at 33-58. At the outset, Plaintiff described his former profession as that of a commercial electrician, in the course of which he would spend most of his time atop ladders while installing a variety of electrical housings, pipes, rigid conduits, and various fixtures – lifting objects that sometimes weigh in excess of 100 pounds. *Id*. at 38-39. Plaintiff, his lawyer, and the ALJ then engaged in an extensive discussion about the various unsuccessful work attempts, and short-term employment, in which Plaintiff had engaged during the period between 2016 and 2017. *Id*. 39-47. When asked why he eventually stopped even trying to engage in this type of work, Plaintiff noted that his pain had become unbearable. *Id*. at 48. When asked why he even bothered to engage in these short-term and unsuccessful attempts at returning to the workplace in 2016 and 2017, Plaintiff responded, "[b]ecause I was about to lose my house that I inherited, but I didn't want to - - I had to take these jobs. I didn't want to take these jobs, but I had to because I was going to lose my house." *Id*. at 49. When asked to detail the particulars of his aches and pains, Plaintiff noted his lower back and his knees, stating that "I couldn't walk. I'd be - - I'd always have to be sitting down or can't walk . . . It took me forever just to leave the job site to go to my car because I couldn't walk." *Id*. at 49-50. Plaintiff then added that at certain job sites, "[s]ometimes they have subassembly jobs, where I'd sit there and build the parts," but that the opportunities for such jobs were quite limited. *Id*. at 50. Thereafter, it became clear to Plaintiff that he could no longer function as an electrician when, in the course of an unsuccessful work attempt during 2017, he found that, "it took me almost an hour to walk to my car sometimes . . . [and] [b]y the time I got to my car, I just wanted to die." *Id*. at 51. Plaintiff concluded his testimony by relating that on a typical day he is relegated to staying in bed virtually

all day, and that he rarely even leaves the house. *Id*. at 52-53.

With that, the ALJ asked the VE to opine whether a hypothetical person of Plaintiff's age, education, and experience could perform Plaintiff's past relevant work as an assembler / wirer if the individual were able to: occasionally lift and carry 50 pounds; frequently lift and carry 25 pounds; sit, stand, and walk six hours in an eight-hour work day with normal breaks; frequently balance, stoop, kneel, crouch, and occasionally crawl. *Id*. at 55. The VE answered in the affirmative but with a caveat – such a person would not be able to function as an electrician in the construction industry, but such a person could function as an assembler / wirer. *Id*. at 55-56. With that, the ALJ invited Plaintiff's counsel to question the VE, however, Plaintiff's counsel declined. *Id*. at 57.

**THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY**

A person filing a claim for social security disability benefits ("the claimant") must show that he has the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment" which has lasted or is expected to last for twelve or more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909.[3] The ALJ must consider all evidence in the claimant's case record to determine disability (*see id*. § 416.920(a)(3)), and must use a five-step sequential evaluation process to determine whether the claimant is disabled (*see id*. § 416.920). "[T]he ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

Here, the ALJ set forth the applicable law under the required five-step sequential evaluation process. *AR* at 16-17. At Step One, the claimant bears the burden of showing he has not been engaged in "substantial gainful activity" since the alleged date on which the claimant became disabled. *See* 20 C.F.R. § 416.920(b). If the claimant has worked and the work is found to be substantial gainful activity, the claimant will be found not disabled. *See id*. The ALJ found that Plaintiff meets the insured status requirements of the Social Security Act through September 30,

---

[3] The regulations for supplemental security income (Title XVI) and disability insurance benefits (Title II) are virtually identical though found in different sections of the CFR. For the sake of convenience, the court will generally cite to the SSI regulations herein unless noted otherwise.

7

2020, and that he had not engaged in substantial gainful activity since the alleged onset date. *AR* at 17. At Step Two, the claimant bears the burden of showing that he has a medically severe impairment or combination of impairments. *See* 20 C.F.R. § 416.920(a)(4)(ii), (c). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)). At Step Two, the ALJ found that Plaintiff suffered from the following severe impairments: osteoarthritis in both knees; status post bilateral knee replacements; degenerative disc disease of the lumbar spine with radiculopathy; and, diabetes. *Id*. at 19-20. However, the ALJ determined that Plaintiff's carpal tunnel syndrome was non-severe because of the finding that it does not cause more than minimal functional limitations. *Id*. at 19.

At Step Three, the ALJ compares the claimant's impairments to the impairments listed in appendix 1 to subpart P of part 404. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). The claimant bears the burden of showing his impairments meet or equal an impairment in the listing. *Id*. If the claimant is successful, a disability is presumed and benefits are awarded. *Id*. If the claimant is unsuccessful, the ALJ assesses the claimant's residual functional capacity ("RFC") and proceeds to Step Four. *See id*. § 416.920(a)(4)(iv), (e). Here, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments. *AR* at 20. Next, the ALJ determined that Plaintiff retained the RFC to perform work at the medium exertional level with the following exceptions: that he can lift or carry up to 50 pounds occasionally, and up to 25 pounds frequently; that he can sit, stand, or walk for six hours in an eight hour workday with normal breaks; that he can frequently climb ramps and stairs; that he can occasionally climb ladders, ropes, or scaffolds; that he can frequently balance, stoop, kneel, and crouch; and, that he can occasionally crawl. *Id*. at 20

At Step Four, the ALJ determined that Plaintiff is able to perform his past relevant work as an industrial assembler / wirer because that job does not require the performance of work-related activities precluded by Plaintiff's RFC. *Id*. at 25. Thus, the ALJ then concluded that Plaintiff had not been under a disability since November 5, 2015. *Id*. at 26.

**DISCUSSION**

In formulating the RFC in this case, the ALJ rejected Plaintiff's pain and symptom testimony as well as the physical restrictions opined by Plaintiff's treating physician, Dr. Zhao. In rejecting the entirety of Plaintiff's testimony, the ALJ used boilerplate language (language which appears in virtually every ALJ decision that has come before this court) to the effect that while Plaintiff's medically determinable impairments could be reasonably expected to cause the alleged symptoms, "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence of record for the reasons explained in this decision." *Id*. at 21. In this regard, the ALJ incorrectly noted that Plaintiff was able to "easily" climb two flights of stairs, walk, swim, and otherwise exercise in a fashion that is inconsistent with the degree of limitations entailed in his testimony. *Id*. However, in support of this incorrect finding, the ALJ cited to a pre-operative "review of [bodily] systems" notation that described Plaintiff's activities <u>before</u> the total replacement of his left knee. *See id*. (citing *id*. at 1387). Thus, the ALJ's reliance on this outdated and out-of-context notation such as to reject the entirety of Plaintiff's symptom testimony is unfair and unreasonable. The remainder of the ALJ's explanations for rejecting Plaintiff's testimony fares no better. For example, the ALJ rejected Plaintiff's testimony about his back pain on grounds that Plaintiff has not sought "other treatment" for his spinal issues, "such as acupuncture." *Id*. at 21.[4] Beyond this, the ALJ seems to have simply gathered a series of out-of-context snippets from here and there in the record in order to serve as *ad hoc* justifications for his pre-judgment that Plaintiff's testimony should be and will be rejected – such as relying on isolated notations that at some unidentified moment in the past, Plaintiff was observed as having a normal gait. *Id*. at 21-22. Defendant's contentions in this court in defense of the ALJ's errors are no more persuasive than the ALJ's reasoning and warrant little, if any, discussion. *See* Def.'s Mot. (dkt. 17) at 12-16. In this regard, for example, Defendant notes

---

[4] A clear demonstration of exactly how unfair was the evaluation of Plaintiff's testimony in this case is the fact that immediately after the ALJ justified disbelieving Plaintiff's description of his pain and its consequential limitations because he supposedly did not pursue acupuncture treatment, is the ALJ's statement to the effect that: "[i]n February [of] 2016, the claimant reported some pain reduction[,] while at rest, due to the acupuncture and physical therapy; however, he also reported that his activity-related pain is still the same." *Id*. at 22.

that because Plaintiff received "conservative treatment for his back pain," and because he did not require back surgery, "the ALJ reasonably found that Plaintiff's lack of aggressive treatment undermined his allegations of disabling symptoms and limitations." *Id*. at 13. This is nothing more than a dizzying exercise in flawed logic and, put a different way, Defendant's argument merely boils down to the contention that Plaintiff's condition could have been worse than it was, but because it wasn't worse, then it cannot be as bad as made out by Plaintiff's testimony.

It should be noted that the ALJ in this case did not find that Plaintiff had engaged in any degree of malingering – as evidenced by the ALJ's statement to the effect that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms." *Id*. at 21. Thus, "[w]hen an Administrative Law Judge (ALJ) determines that a claimant for Social Security benefits is not malingering and has provided objective medical evidence of an underlying impairment which might reasonably produce the pain or other symptoms she alleges, the ALJ may reject the claimant's testimony about the severity of those symptoms only by providing specific, clear, and convincing reasons for doing so." *Brown-Hunter v. Colvin*, 806 F.3d 487, 488-89 (9th Cir. 2015). Furthermore, the Court of Appeals for the Ninth Circuit has "'repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities . . . does not in any way detract from her credibility as to her overall disability.'" *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (quoting *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001)). In this context, "[t]he ALJ must make 'specific findings relating to [the daily] activities' and their transferability to a work setting to conclude that a claimant's daily activities warrant an adverse credibility determination." *Id*. (quoting *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005)).

Here, the ALJ did not find malingering and, as discussed above in great detail, the record contains a dearth of objective medical evidence of underlying spinal and knee impairments that reasonably could be expected to produce Plaintiff's pain and other symptoms. At the same time, the ALJ failed to make specific findings on Plaintiff's daily activities and their alleged transferability to a work setting; and, the ALJ did not venture to explain how Plaintiff's activities were inconsistent with his testimony that he suffers from near-constant pain and his need to avoid

walking and standing, let alone lifting and carrying heavy objects, or the ALJ's indefensible finding that Plaintiff could somehow climb ropes (an activity that would be difficult even for trained athletes in prime physical condition). Also, there is scant evidence, if any, that Plaintiff's pain medications (or acupuncture treatments) could achieve any degree of pain control that would enable him to engage in sustained full-time work at a low level of absenteeism and a high level of on-task performance. Further, the ALJ also failed to consider the effects of narcotic pain medication on Plaintiff's concentration and ability to focus. Accordingly, because the court finds that the ALJ failed to provide specific, clear, and convincing reasons for rejecting Plaintiff's testimony, that testimony will now be credited as true as a matter of law; and (as discussed below), on remand, the court directs that the formulation of the RFC, as well as the inquiry at Step Four and Step Five be undertaken using a hypothetical that credits the entirety of Plaintiff's testimony as to his pain and functional limitations as true.

As to the medical opinion evidence, the ALJ rejected the opinion of Plaintiff's treating physician, Dr. Zhao, while basing the RFC entirely on the opinion of non-examining state agency consultants, Drs. Capeda and Arnold. *See AR* at 24-25. In this regard, the ALJ merely noted that Dr. Zhao's opinion was "inconsistent with the record as a whole . . . as well as being overly restrictive." *Id*. The ALJ then added that Dr. Zhao's opinion was "not supported by objective findings" and was "inconsistent with the claimant's activities of daily living as well, which include being able to clean house (sic), drive a car for up to 30 miles, swim, and ride a bicycle outdoors." *Id*. On the other hand, the ALJ gave the October 17, 2016 opinion of the non-examining state agency consultants, Drs. Capeda and Arnold, controlling weight. *See id*. at 24-25. Indeed, the RFC in this case was formed entirely based on the matching (non-examining) opinions of Drs. Capeda and Arnold which boiled down to the incorrect notion that there is basically nothing wrong with Plaintiff in that he was perceived as being able to spend several hours per day carrying around 50-pound weights, while being able to spend most of an 8-hour day carrying around a 25-pound weight, and that he was even capable of such remarkable feats of proto-gymnastic ability as climbing ropes. *See id*. at 25-26 (ALJ's opinion); *see also id*. at 64-65 (Dr. Capeda's opinion).

Medical opinions are "distinguished by three types of physicians: (1) those who treat the

claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The medical opinion of a claimant's treating provider is given "controlling weight" so long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2); *see also Revels*, 874 F.3d at 654. In cases where a treating doctor's opinion is not controlling, the opinion is weighted according to factors such as the nature and extent of the treatment relationship, as well as the consistency of the opinion with the record. 20 C.F.R. § 404.1527(c)(2)-(6); *Revels*, 874 F.3d at 654.

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (alteration in original) (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id*. (quoting *Bayliss*, 427 F.3d at 1216); *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("[The] reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion."). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his [or her] interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). Further, "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester*, 81 F.3d at 831; *see also Revels*, 874 F.3d at 654-55; *Widmark v. Barnhart*, 454 F.3d 1063, 1066-67 n.2 (9th Cir. 2006); *Morgan v. Comm'r*, 169 F.3d 595, 602 (9th Cir. 1999); *see also Erickson v. Shalala*, 9 F.3d 813, 818 n.7 (9th Cir. 1993). In situations where a Plaintiff's condition progressively deteriorates, the most recent medical report is the most probative. *See Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986).

As stated above, the ALJ in this case engaged in a great deal of temporal conflation regarding the activities on which he relied to reject Plaintiff's testimony and the restrictions ordered by his treating physician. This is manifest in the reliance upon a notation that indicated that Plaintiff had, at some point in the past, attempted to exercise by swimming (albeit with great pain) or that he had *attempted* other exercises, such as climbing stairs, as noted on a pre-operative form *before* his second total knee replacement. In this case, the ALJ ignored the great weight of the objective medical evidence, as well as ignoring the considered opinion of Plaintiff's treating physician, such as to give controlling weight to arbitrarily-formed and unsupported opinions of two non-examining state agency consultants. As stated above, the opinion of non-examining consultants cannot, by themselves, constitute substantial evidence that justifies the rejection of a treating physician's opinion – which is exactly what happened here. Accordingly, because the ALJ failed to provide specific and legitimate reasons, supported by substantial evidence, for rejecting Dr. Zhao's opinions as to Plaintiff's work-restrictions, Dr. Zhao's opinions will now be credited as true as a matter of law.

### ***Scope of Remand***

The mandate on remand in this case will have a limited scope. On remand, the ALJ is directed to do nothing more than to reengage the sequential evaluation process, from the formulation of the RFC forward, while giving controlling weight to Plaintiff's testimony and the opinions of Dr. Zhao as described and discussed herein. Thus, the ALJ is directed to formulate the RFC on the exclusive basis of Plaintiff's testimony and Dr. Zhao's opinions because that evidence has now been credited as true and will now be the law of the case. *See Stacy v. Colvin*, 825 F.3d 563, 566 (9th Cir. 2016) ("the law of the case doctrine and the rule of mandate apply to social security administrative remands from federal court in the same way they would apply to any other case."); *see also Benecke*, 379 F.3d at 595 ("Allowing the Commissioner to decide the[se] issue[s] again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication.").

//

//

**CONCLUSION**

Thus, for the reasons stated above, Plaintiff's Motion for Summary Judgment (dkt. 15) is **GRANTED**, and Defendant's Cross-Motion (dkt. 17) is **DENIED**. The case **REMANDED** pursuant to the instructions provided herein.

**IT IS SO ORDERED.**

Dated: March 11, 2021

_____
ROBERT M. ILLMAN
United States Magistrate Judge